IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WESTERN KENTUCKY

## AFFIDAVIT IN SUPPORT OF FORFEITURE COMPLAINT

I, J. Blake Carter, Special Agent for the United States Secret Service, being duly sworn, deposes and says:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the United States Secret Service (USSS or Secret Service).  During my tenure with the Secret Service, I have been assigned to investigate violations of federal laws, including violations of Title 18 of the United States Code.  I received criminal investigative training at the Federal Law Enforcement Training Center in Glynco, Georgia, and at the James J. Rowley Secret Service Training Center in Beltsville, Maryland, pertaining to criminal investigations of counterfeit currency, bank fraud, money laundering, wire fraud, access device fraud, and identity theft.   I have experience in working multiple financial crimes to include counterfeit, business email compromise, credit card skimming, money-mule, and various bank related crimes. In addition, I have received specialty training at the National Computer Forensics Institute (NCFI). This training included basic network intrusion, email analysis, operating systems procedure among other popular financial-crime based platforms; including training in virtual currency, cryptocurrency, Bitcoin, Mining, and blockchains.  I am an investigative and law enforcement officer of the United States, in that I am empowered by law to

Exhibit A-1

conduct investigations and to make arrests for felony offenses, under authority of 18 U.S.C. § 3056.

2.      The statements contained in this affidavit are based in part upon my experience, my knowledge of the facts and circumstances surrounding this investigation, and on information provided to me by other law enforcement personnel and other witnesses.  This affidavit is intended to show only there is probable cause for the Complaint and does not set forth all of my knowledge about this ongoing investigation.

## PROPERTY TO BE FORFEITED

3.      The defendant property is:  all funds, monies, and other things of value stored in or accessible at Binance associated with user ID ending 4010 and Binance User ID ending 2020 in the name of Wang-Lu (hereinafter "account"). On or about February 20, 2023, the United States Secret Service served a federal seizure warrant on Binance, which transferred the contents of the account to the United States Secret Service on or about March 21, 2023.

## LEGAL AUTHORITY FOR SEIZURE & FORFEITURE

4.      Based on my experience and the information contained in the subsequent paragraphs, there is  probable cause to believe that this property is subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) because the property was involved in or traceable to property involved in money laundering in violation of 18 U.S.C §§ 1956, and constitutes proceeds from a specified unlawful activity (as defined in 18 U.S.C. § 1956(c)(7) and 18 U.S.C. § 1961(1)).

Exhibit A-2

5.      Title 18 U.S.C. § 1956 (a)(1) makes it a crime to knowingly conduct or attempt to conduct a "financial transaction" with proceeds from "specified unlawful activity" (SUA) with specific intent to: promote the SUA, conceal or disguise the source, origin, nature, ownership, or control of the proceeds; evade reporting requirements; or evade taxes.  Title 18 U.S.C. § 1956(h) prohibits conspiracies to commit money laundering.

6.      The purpose of "money laundering" as defined by 18 U.S.C. § 1956 is to disguise illicit nature of funds by introducing it into legitimate commerce and finance thereby making them "clean."  This financial process is most commonly conducted using three steps referred to as "placement," "layering," and "integration."  Typically, the "placement" phase of this financial process takes place when proceeds from illicit sources are placed in a financial institution or business entity.  "Layering" takes place when these funds are then used in seemingly legitimate commerce transactions which makes the tracing of these monies more difficult and removed from the criminal activity from which they originated.  Finally, the "integration" phase is when these funds are then used to promote the unlawful activity or for the personal benefit of the money launderers and others.

7.      There is also probable cause to believe that this property is subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) because the property constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1343 or a conspiracy to commit such offense (in violation of 18 U.S.C. § 1349).

8.     The property is subject to seizure and forfeiture via civil and criminal

seizure warrants under 18 U.S.C. §§ 981(a)(A) and (C) and (b), 18 U.S.C.

§ § 981(a)(1)(C), and 982(a)(1) and (b), 21 U.S.C. § 853(f), and 28 U.S.C. § 2461.

9.     Under 18 U.S.C. § 984, for any forfeiture action in rem in which the subject

property consists of cash, monetary instruments in bearer form, or funds deposited in an

account in a financial institution:

      a.     The government need not identify the specific funds involved in the offense that serves as the basis for the forfeiture;
      b.     It is not a defense that those funds have been removed and replaced by other funds; and
      c.     Identical funds found in the same account as those involved in the offense serving as the basis for the forfeiture are subject to forfeiture.

10.     In essence, 18 U.S.C. § 984 allows the government to seize for forfeiture

identical property found in the same place where the "guilty" property had been kept.

The statute does not, however, allow the government to reach back in time for an

unlimited period.  A forfeiture action (including a seizure) against property not directly

traceable to the offense that is the basis for the forfeiture cannot be commenced more

than one year from the date of the offense.

11.     Funds in a bank are fungible, thus making them subject to transfer or

withdrawal with relative ease.  Furthermore, I know that once U.S. Currency is converted

to cryptocurrency, the funds become difficult to recover and trace.

## FACTS SUPPORTING PROBABLE CAUSE

**Investigation Background**

Exhibit A-4

12.     The United States Secret Service is investigating a money laundering scheme, which concerns possible violations of, inter alia, 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. §§ 1956 and 1957 (Laundering of Monetary Instruments), and conspiracy to commit these violations under 18 U.S.C. §§ 1349 and 1956(h).

13.     This investigation has revealed that the account at Binance, a cryptocurrency exchange, held in the name of Wang-Lu, received proceeds from various methods of wire fraud and money laundering schemes within the United States.

14.     By way of background, I have learned through my training and experience that there are many different types of wire fraud schemes, such as romance scams, lottery scams, Social Security scams, and advance payment fee scams, among others.  The wire fraud schemes rely on unsuspecting victims to utilize various types of financial accounts in order to conduct financial transactions that facilitate the fraud schemes. On most occasions such as this one, victims are persuaded to move their funds to a "secure" location in fear of the current accounts being compromised.  Often, the initial transactions are in small amounts and are designed to gain the victim's trust.  Subsequent transactions are often in larger amounts and cause financial loss to the victim.  The goal of these wire fraud schemes, described herein, is to steal money from the victims through fraud and deceit.

15.     On 1/26/2023, U.S. Secret Service Investigative Analyst, Jerry Peterson received a phone call from Lyndon Police Department Assistant Chief Robert Schroeder (located in the Western District of Kentucky), who informed him he had a scam victim (identified as A.S. ) sitting in his office who had sent $7k of her/his own funds to the

Exhibit A-5

scammer's bitcoin wallet, believing her/his computer and financial accounts had been compromised. Upon further examination and investigation by IA Peterson and in collaboration with Chief Schroeder, this is what he discovered: Victim stated s/he bought a new computer because her/his old computer "crashed." When the old computer "crashed", s/he went through the recovery process, which installed the original version of Windows 7 for that machine, but when s/he tried to upgrade to Windows 10, s/he was told s/he could not—so s/he decided to buy a new computer in order to run Windows 10. S/he set up her/his brand new Dell desktop on 1/24/2023. S/he went through the normal setup procedures, then s/he started going to each of her/his financial institutions to link her/his new computer with her/his financial accounts. S/he claims to have visited courierjournal.com. As well as opening her/his (AOL) email account. S/he said s/he does remember her/his (AOL) email acting strangely starting several months prior, her/his spam folder starting filling up with hundreds of spam emails every day. S/he would have to go into her/his spam folder every day and delete hundreds of spam emails, which took a lot of time and caused her/his computer to run very slow. After looking at her/his email is when a "Microsoft Security" popup occurred, which prompted to call a phone number. The notice on the computer advised victim that s/he needed to contact the Microsoft Corporation. The victim contacted the phone number listed (620-230-5862, Pittsburgh, KS) and spoke with an unknown subject who identified himself as "Robert Williams". The suspect spoke with the victims and advised them they would need to speak with their financial institution. The suspect transferred the victim to an unknown subject claiming to be from Republic Bank. This subject stated he would put the victim's

Exhibit A-6

account on a high alert because their computer and IP address had been hacked. This subject then transferred the subjects to an unknown subject claiming to be "David Robbins" from the Federal Trade Commission. This subject had control of the victim's computer and printed out a letter from the Federal Trade Commission and a Non Disclosure Agreement from the Federal Trade Commission from the victims' computer. This subject told the victims that there was a transfer of $7000 from their account to the website betonline.com. The subject advised the victim that they would need to create a duplicate transaction to resolve the matter. The subject advised that the victim would need to withdraw $7000 from their account and create the duplicate payment at a Bitcoin machine located at the Dongor Food Mart located at 1735 Newburg Road in Louisville. The victim withdrew the money from their account and deposited it into the Bitcoin machine as requested. The victim was then instructed to send an image of the receipt to the "David Robbins" subject. The victim sent this information and a copy of the signed non-disclosure agreement to the phone number 915- 320-8976. The subject advised the victims that their other accounts were also compromised and that he would need to secure their other IRA accounts. The victim then called their financial advisor who advised the victim that they had been the victim of a scam. The victim notified their bank and requested a police report. The victim has the following phone numbers associated with this incident: 620-230-5862- "Microsoft" 425-300-5806 - "David Robins" 425-300-5846 - Unknown 425-300-5680 - Unknown 915-320-8976 - "David Robbins. S/he spoke to 3 different individuals for different reasons during this scam.  They were in her/his computer going through her/his email folders, and told her/his that all of her/his financial

Exhibit A-7

accounts had been compromised.  S/he followed their instructions to send $7000.00 via

bitcoin, but then got suspicious and decided to call her/his financial manager, who told

her/him that s/he'd been scammed.

16.     After several requests to Binance for digital transaction records, IA

Peterson constructed a digital roadmap including the path of the victim's stolen funds.

DETAILS OF INVESTIGATION

**WANG-LU BINANCE ACCOUNT**

17.     The account records for Wang-Lu's Binance wallet were obtained.  The

Binance records reflect that the Binance account is registered to Wang-Lu.  The records

include a foreign photo ID inscribed "Wang-Lu'' and account number ending in 2020.

The account is associated with an email address of financeteam001@outlookcom.  The

Binance account was opened on or about July 27, 2021.

18.     Concerning the transactions described herein, USSS IA Peterson utilized

Blockchain analysis, including records from Binance, and other investigative techniques,

to trace the proceeds from the fraud in an attempt to launder the funds. These funds were

remitted to Wang Lu's account with the estimated value of 22.11 Bitcoin. In correlation

with the transaction map in this affidavit, these transactions took place as follows:

19.     On 1/25/2023 victim sent .2434 Bitcoin, valued as $7000 US Dollars, to the

Bitcoin wallet identified as (bc1q5d...jwlvr8).

20.     On 1/26/2023 subject split these funds from the victim, along with other

funds from unknown sources into (2) wallets: (1) a bybit address identified as

1F3sH...qaNTrg. (2) Bitcoin wallet identified as bc1qru...wfskmt.

Exhibit A-8

21.     On 1/28/2023, from here funds were traced through the bitcoin wallet used (wfskmt). From this wallet funds were moved to another split into (2) more accounts: (1) a Binance address identified as (12C9LQ…afoBaG) and (2) a Bitcoin wallet identified as (bc1q2n…qmmy0w). Within the Binance address (afoBag), the funds were converted from Bitcoin to USDT.

22.     On 1/28/23, 46,760 USDT was transferred from account (afoBag) to a cryptocurrency wallet address identified as (TT58di…GMpRht). 15,487 USDT transfer from (GMPrht) to a Binance address identified as (TVfdtz…RZtrzs). 56,999 USDT transferred from (RZtrzs) to Binance address identified as (TSSfEL…8CPkp9).

23.     On 1/30/2023, 56,818 USDT was transferred from (8CPkp9) to a Binance user account with identified ID Ending 4010. Our investigative records also reveal that $400,000.00 USD were transferred out of this account on 1/28/2023. On 2/8/2023, an additional $300,000.00 USD was transferred out of this account. From  October 2022 through February 2023, there were 1,058 Binance pay transactions from/to this account (Ending 4010).

24.     As of 2/15/2023, the contents of the account had an amount of $488,456.97923737 USDT, or a value worth approx. 22 Bitcoin.

25.     Concerning the transactions discussed in this affidavit, through my training and experience I am aware that subjects who engage in actions such as this, ie: placing funds in multiple cryptocurrency accounts, especially for shorter periods of time, that these funds typically end up in accounts owned by the person(s) committing the fraud, which can be bank accounts, overseas accounts, or cryptocurrency exchanges. These

multiple transactions make it easier for these subjects to launder the fraudulent funds and make it more difficult to track, since the transactions are instantaneous and virtual. Within law enforcement, this action can typically be referred to not only as money laundering, but as "layering." This method can make it very difficult for law enforcement to track down and recover. Moving these funds repeatedly in this fashion results in various funds being comingled, and thus making it difficult to trace. The funds from our victims were sent to Wang-Lu's account, and were most likely being comingled with other victims of similar financial crimes.  This practice is a fundamental strategy for wallet users and financial criminals to stabilize and hedge their earnings to protect against the volatility in the cryptocurrency market.

26.     On 3/17/2023 USSS identified an additional confirmed victim in the same scam. Victim is identified as L.S., and s/he sent a total of $25,000.00 to the same fraudsters on the same day as victim A.S. and IA Peterson confirmed that these funds were funneled through the same suspect wallet as A.S.'s funds. There are also additional names that have been recovered as owners of accounts that were used to launder and/or funnel the fraudulent funds from the victims.

27.     Like victim A.S., L.S. sent her/his funds to an account, which were then eventually split and moved through several transactions (in an effort to obscure the funds). Portions of both victims' funds ended up in a withdrawal address bc1q5d…..jwlvr8. From that point the tracing of the funds remained identical.

28.     Victim L.S. stated s/he was locked out her/his computer and a message appeared relaying that s/he had 'been hacked.' Program left a support number to call, after dialing

the number, L.S. was persuaded through talking to multiple individuals including a fraudster posing as a FTC (Federal Trade Commission) representative, that in order to attempt to trace who stole her/his money s/he would need to send $25,000.00 via a Bitcoin locker. S/he was instructed by the gentlemen with an Indian accent to go to two separate locations and send the money. L.S. completed two transactions; $15,000 and $10,000. At this point the fraudsters tried to persuade the victim with more instructions on "how to save his/her funds and/or identity," along with demanding additional funds. However, at this point L.S. was growing suspicious—s/he refused and notified law enforcement.

29.     Victims A.S. and L.S. both stated to IA Peterson that the fraudsters they spoke with over the phone during the scam had Indian accents.

30.     IA Peterson identified the account owner of the first Binance address (12C9LQ…..afoBaG)  who received the funds before moving them again. That person is identified as AHEMAD SIDDIKBHAI NAVIWALA, from the Republic of India (personal identifiers omitted).

31.     The second Binance deposit address owner (no. TVfdtz…..RZtrZS) was also identified: RAJWANI SHABBIR MOHMEDALI, from the Rep. of India (personal identifiers omitted).

32.     Binance deposit address (TSSfEL…..8CPkp9) was the third and final owner identified, before they moved the funds over to 'Wang-Lu'. The owner of this account is identified as: SACHIN ROHIDAS KOLI, from the Rep. of India (personal identifiers omitted).

33.    All (3) Binance account owners identified above, (NAVIWALA, MOHMEDAL, and KOLI) were discovered to be receiving funds, and/or swapping the tokens using Bitcoin, and/or attempting to send out other token(s) to empty their accounts to 0.00. All (3) users identified above were found to use wallets that commonly and routinely have amounts of 0.00, as in they were used to strictly receive and move out funds; law enforcement recognizes these actions as strong indicators of money laundering. NAVIWALA account ending in (obag) was opened in May 15 2022, and the first transaction was May 19, 2022. All three of these users opened accounts that can be shown to receive funds, then instantly sending funds back out to other accounts. On most instances this pattern would routinely take place during a timeframe of less than a day.

34.    IP addresses utilized by the account owned by Wang-Lu were traced back to two separate locations, one based in China and the other based in India. This could indicate logging in from a location in China as well as a location based in India. Unless he/she is using VPN mirroring, this could indicate  that either Wang-Lu was traveling to/from India during the timeframe of the fraud, and/or they are sharing account login information and access to other associates/accomplices.

35.    On 2/27/2023 I received contact from an email appearing to be associated with the account being seized. I received an email to my government email, the email stated: "Dear sir, My Binance uid is [omitted] ending 4010 Currently I can't log in to my Binance account. Can you tell me  the reason for freezing the account. If any information is needed to unfreeze the account I can provide it at any time. Looking forward to your reply."  Senders email address was finance@helpsucc.com (not the email address

associated with the Wang-Lu account).  I attempted to reach out to this email and gain additional information.

36.     On 3/1/2023 they responded to my questions with the following reply:

"Hi,sir
I am very glad to receive your reply, the following is the information I provide you need, please check
Full Name / Surnames: WangLu(王璐)
Date of birth: [omitted]
Current home address:[street omitted] Dong vilage, Weidu District, Xuchang City, Henan Province, China (河南省许昌市魏都区董庄399号)

Place of birth:Xuchang City, Henan Province, China （中国河南省许昌市）
Place of citizenship:China  （中国）
Place of employment: Hangzhou, Zhejiang （中国杭州浙江）
Cellular phone number:18041318393
Work phone number:1804131839"

At 3:23 AM same day, I received a duplicate message like above, with "Hi,sir

I am very glad to receive your reply, the following is the information I provide you need, please check." This message was from the same sender but was also CC'd to (wangguanhua@helpsucc.com).  And on 3/3/2023, I received another same response from (the same two emails) with the header "My Binance uid is [Account Ending 4010], The following is the information that can verify my identity. Please check it. At present, my account cannot be logged in. Please tell me the reason and I am looking forward to your reply.

On 3/3/2023 I sent additional questions:

Hello,

Thank you for responding with your answers. In order to move to the next phase please answer the additional following questions

Exhibit A-13

1. What is the business you work for?
2. Please describe the nature of the business regarding the crypto transactions related to your crypto account?
3. Who are you doing business with?  Provide business records to support your claims.

37.     On 3/8/2023 they responded using the original email address associated with

Wang-Lu (financeteam001@outlook.com) and using a new name (Ethan).  This email

was as follows:

"Dear Sir :

   Thank you for your reply , the answer for your questions are as follow:

1. What is the business you work for?
   -----We are doing crypto currency agent , buy from our partners on a low price, and sell to our partners on a high price
2. Please describe the nature of the business regarding the crypto transactions related to your crypto account?
   ----- Our business is just a intermediary agent ,  buy low and sell high.
3. Who are you doing business with?  Provide business records to support your claims.
   -----We only doing business with binance users,  only 3-5 guys are our crypto currency vendor,  no other source,  attach the screenshot for you , which ask from them , and they take the screenshot from their phone.

   By the way , could you tell us whats the reason you give the notice to hold our acount , from our side everything we do is legal, kindly help us to understand the situation.
   Any other information you need , please tell us , we will give all things what we know to support your investigate.
_____

Ethan
Finance team"


         They also attached a zip folder within the email titled "Business Records."

These 'business records'' were opened and scanned for harmful software and were

viewed by IA Peterson; it contained (26) screenshots of 'Payment Details' from the app

WhatsApp.

WhatsApp is a freeware, cross-platform communication application that allows users to send unlimited images, videos, media, and location coordinates using a device's data plan or Wi-Fi. Documents of up to 100 MB may be shared through WhatsApp. In addition to sending content in messages, the WhatsApp application also includes real-time voice and video call capability using an Internet connection. This application is available for both mobile and desktop computing. Facebook Inc. owns WhatsApp, but the application operates as a standalone application. WhatsApp utilizes end-to-end encryption for both its messaging, document sharing, and real-time voice and video calls services. Messages are not stored on WhatsApp servers once they are delivered to users—neither WhatsApp servers nor third parties can read user messages due to end-to-end encryption. Law enforcement has been known to work with WhatsApp on several occasions, routinely involving financial scams. WhatsApp has become a popular app for criminals to use, due to its rules/regulations on what data they keep and/or do not keep. The company had been known to increase their multi-media popularity by marketing their lack of storing information. Because of this, WhatsApp is known within the law enforcement community as one of the more commonly used platforms by fraudsters.

There was no further description or explanation within the aforementioned email signed by Ethan using the email associated with the Wang-Lu account.   *Two examples of the screenshots can be seen below:*



38.    On 3/27/2023 I received this email (from financeteam001@outlook.com):

"Dear Sir:

It`s almost 3 weeks past after we provide details , any update about this case .

And kindly help us to know what`s the reason , that suddenly our account freezed.

Exhibit A-16

Dora

Financeteam"

39.     On 4/3/2023 I received the following (from financeteam001@outlook.com, with

wangguanhua@helpsucc.com CC'd):

"Dear Binance Team,

Our account has been blocked from 12th Feb, with around 680k USDT frozen in it. We

request for the exact reason why our account is blocked.

We have been contacted your customer service for days. And we checked that our fund

has already been transferred out by binanace system on 21th Mar. , and we were

informed that our account would be cancelled forever on 5th Apr.

Kindly inform us the following points:

1. The exact reason for our account blocking.

2. We request your team to release our fund asap and activate our account again.

3. Our binance account mustn't be cancelled unless the issue is solved.

Hope your team have good consideration about our situation and process issue, otherwise

we will take some necessary actions toword this case. Lawsuit and media exposion will

be our choice, also we will pay a visit to binance office to negotiate.

Best Regard,

Dora"

This email had two attachments, which were zip folders titled "DOC.zip. This file was

safely viewed and it displayed (9) screenshots similar to the below screenshot from

Binance:

Exhibit A-17





These attachments had minor relevance to the investigation and included no additional or pertinent information. Later that day I received a reply including the previous email with the following:

Exhibit A-18

"Dear Team,

Please give respond of our request, it's urgent!!!!

Sincerely
Dora"

This email had a web based attachment link, that was titled "Request to unfreeze Binance

account.eml) This link was also safely opened; and was displayed as the following:



40.     On 4/4/2023 I received another email with the following:

"Dear Team,

   We just hope you can notice that our request,

if tomorrow our account be cancelled forever ,

we will take some necessary actions toward this case.

Lawsuit and media exposion will be our choice,

also we will pay a visit to binance office to negotiate.

Sincerely

Dora"

This email was sent from financeteam001@outlook.com, with market@binance.com

CC'd.

41.    Later on 4/4/2023 I received an additional email:

"Hi Team,

Please provide us with the government's explanatory documents related to the seizure of funds,
inform us of the reason for freezing, and do not embezzle our property for no reason

Sincerely
Dora"

This email was from financeteam001@outlook.com, and was addressed to myself, and

two other emails: market@binance.com, and bam4trading@gmail.com, with

wangguanhua@helpsucc.com CC'd.

42.    Throughout the emails received as described above in the correspondences, none

of the email addresses matched that of the (3) individuals (NAVIWALA /MOHMEDALI

/KOLI), that were each linked to moving the funds in and out of accounts, and eventually

to the Wang-Lu account.

ADDITIONAL VICTIMS

43.    This is an ongoing investigation, wherein additional victims are being identified.

On 5/30/2023 IA Peterson identified (1) additional victim, through information provided

by Cash Cloud Inc.  The  victims identified thus far described at least one occurrence

throughout the scam of talking to someone over the phone with what was described as an Indian or middle-eastern accent.  Cash Cloud Inc. provided transaction information showing that on 1/27/23, V.P. sent two transactions; (dcdd2f…93f8af) totaling in .26964941 Bitcoin and  (ebe8f9…38327f) totaling .05885106 Bitcoin. The combined total for these two transactions was a U.S. dollar amount of $9500.00.  Both of these transactions were sent to (bc1qsr…zlulkz.) withdrawal address. On 1/28/23 that withdrawal address sent a total of 2.09540218 Bitcoin to *(this total included the totality of funds in addition to more fund*s) thru Bitcoin transaction hash: (971af7…b4aeda), this hash was the same transaction of financial loss as previous victims A.S. and L.S., on the same date of 1/28/2023. Simultaneously all (3) victims funds were forwarded to Binance address (12C9LQ…afoBaG) belonging to the same account owner mentioned previously, owner: NAVIWALA. This transaction totaled 3.65406 Bitcoin which included the victims' funds along with other comingled funds.

44.    On 5/26/2023 IA Peterson was able to make contact with V.P. S/he explained to IA Peterson that s/he received a warning of a virus on her/his computer and allowed the fraudsters in her/his PC. IA Peterson explained that s/he was scammed the same way as the other victims. V.P. experienced several similar factors that A.S. and L.S. experienced; such as bank interactions, bitcoin machines, and "faulty anti-virus" software."

45.    Within the last year, United States Secret Service among other federal agencies have seen a dramatic rise in financial scams of this nature. Elderly people who are retired are the most-common target. Cryptocurrency-based scams, romance scams and money-

mule schemes are known to encompass a substantial amount of our financial fraud

investigations.

[PAGE INTENTIONALLY LEFT BLANK UNTIL NEXT PAGE]

46.   Transaction map is located below, which includes 3 of the victims, suspects, transaction hashes, and wallet addresses:



Exhibit A-23

47.   **BACKGROUND ON CRYPTOCURRENCY**

a.   Based on my training, research, education, and experience, I am familiar

with the following relevant terms and definitions:

b.   Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer,

network-based medium of value or exchange that may be used as a substitute for

fiat currency to buy goods or services or exchanged for fiat currency or other

cryptocurrencies.[1]  Examples of cryptocurrency are Bitcoin, Litecoin, and Ether.

Cryptocurrency can exist digitally on the Internet, in an electronic storage device,

or in cloud-based servers.  Although not usually stored in any physical form,

public and private keys (described below) used to transfer cryptocurrency from

one person or place to another can be printed or written on a piece of paper or

other tangible object.  Cryptocurrency can be exchanged directly person to person,

through a cryptocurrency exchange, or through other intermediaries.  Generally,

cryptocurrency is not issued by any government, bank, or company; it is instead

generated and controlled through computer software operating on a decentralized

peer-to-peer network.  Most cryptocurrencies have a "blockchain," which is a

distributed public ledger, run by the decentralized network, containing an

immutable and historical record of every transaction.[2]  Cryptocurrency is not

illegal in the United States.

---

1 Fiat currency is currency issued and regulated by a government such as the U.S. Dollar, Euro, or Japanese Yen.
2 Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

c.      Bitcoin[3] ("BTC") is a type of cryptocurrency.  Payments or transfers of value made with bitcoin are recorded in the Bitcoin blockchain and thus are not maintained by any single administrator or entity.  As mentioned above, individuals can acquire bitcoin through exchanges (i.e., online companies which allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), bitcoin ATMs, or directly from other people.  Individuals can also acquire cryptocurrencies by "mining."  An individual can "mine" bitcoins by using his or her computing power to solve a complicated algorithm and verify and record payments on the blockchain.  Individuals are rewarded for this task by receiving newly created units of a cryptocurrency.  Individuals can send and receive cryptocurrencies online using many types of electronic devices, including laptop computers and smart phones.  Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers.  If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity.  Bitcoin transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous.  And while it is not completely anonymous, bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and financial systems.

---

3 Since Bitcoin is both a cryptocurrency and a protocol, capitalization differs.  Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the cryptocurrency.  That practice is adopted here.

d.      Cryptocurrency is stored in a virtual account called a wallet.  Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency.  A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key.  To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key").   A public address is represented as a case-sensitive string of letters and numbers, 26–36 characters long.  Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address.  Only the holder of an address' private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

e.      Although cryptocurrencies such as Bitcoin and have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering, and is an oft-used means of payment for illegal goods and services.  By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track transactions.  As of June 1, 2023, one bitcoin is worth approximately $26,975.20, though the value of bitcoin is generally much more volatile than that of fiat currencies.

     f.     Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware wallet"), downloaded on a PC or laptop ("desktop wallet"), with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as an online account associated with a cryptocurrency exchange.  Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet.  Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, Keepkey, or Nano Ledger).  In addition, paper wallets contain an address and a QR code[4] with the public and private key embedded in the code.  Paper wallet keys are not stored digitally.  Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password.  Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase).  I also know that individuals possessing cryptocurrencies often have safeguards in place to

---

4 A QR code is a matrix barcode that is a machine-readable optical label.

ensure that their cryptocurrencies become further secured in the event that their

assets become potentially vulnerable to seizure and/or unauthorized transfer.

g.     Cryptocurrency "exchangers" and "exchanges" are individuals or

companies that exchange bitcoin for other currencies and cryptocurrencies,

including U.S. dollars and tether.  According to Department of Treasury, Financial

Crimes Enforcement Network ("FinCEN") Guidance issued on March 18, 2013,

virtual currency administrators and exchangers, including an individual exchanger

operating as a business, are considered money services businesses.[5]  Such

exchanges and exchangers are required to register with FinCEN and have proper

state licenses (if required under applicable state law).  From my training and

experience, I know that registered money transmitters are required by law to

follow Bank Secrecy Act anti-money laundering ("AML") regulations, "Know

Your Customer" ("KYC") protocols, and other verification procedures similar to

those employed by traditional financial institutions. For example, FinCEN-

registered cryptocurrency exchangers often require customers who want to open or

maintain accounts on their exchange to provide their name, address, phone

number, and the full bank account and routing numbers that the customer links to

an exchange account.  As a result, there is significant market demand for illicit

cryptocurrency-for-fiat currency exchangers, who lack AML or KYC protocols

and often also advertise their ability to offer customers stealth and anonymity.

---

5 *See* "Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies,"
*available at* https://www.fincen.gov/resources/statutes-regulations/guiadance/application-fincens-regulations-
persons-administering.

These illicit exchangers routinely exchange fiat currency for cryptocurrencies by meeting customers in person or by shipping cash through the mail. Due to the illicit nature of these transactions and their customers' desire for anonymity, such exchangers are frequently able to charge a higher exchange fee, often as high as 9–10% (in contrast to registered and BSA-compliant exchangers, who may charge fees as low as 1–2%).

h.      Some companies offer cryptocurrency wallet services which allow users to download a digital wallet application onto their smart phone or other digital device. A user typically accesses the wallet application by inputting a user-generated PIN code or password. Users can store, receive, and transfer cryptocurrencies via the application; however, many of these companies do not store or otherwise have access to their users' funds or the private keys that are necessary to access users' wallet applications. Rather, the private keys are stored on the device on which the wallet application is installed (or any digital or physical backup private key that the user creates). As a result, these companies generally cannot assist in seizing or otherwise restraining their users' cryptocurrency. Nevertheless, law enforcement could seize cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone, accessing the wallet application, and transferring the cryptocurrency therein to a law enforcement-controlled wallet. Alternatively, where law enforcement has obtained the recovery seed for a wallet (see above), law enforcement may be able to use the recovery seed phrase to recover or reconstitute the wallet on a different

Exhibit A-29

digital device and subsequently transfer cryptocurrencies held within the new

wallet to a law enforcement-controlled wallet.

Regarding Binance, while they hold a Money Service Business Registration in the United

States, their address shows an address located in Malta.  Binance has agreed to accept

legal process and service of warrants electronically from law enforcement in the United

States.

## CONCLUSION

48.    Based on the above, there is probable cause to forfeit all funds, monies, and

other things of value stored in or accessible at Binance associated with user ID Ending

4010 in the name of Wang-Lu.

49.    Based on my experience and the information herein, there is  probable

cause to believe that all funds, monies, and other things of value stored in or accessible at

Binance associated with user ID ending in 4010 in the name of Wang-Lu constitute

proceeds from a specified unlawful activity (as defined in 18 U.S.C. § 1956(c)(7) and 18

U.S.C. § 1961(1)) and  are traceable to a money laundering transactions and are therefore,

subject to forfeiture pursuant to pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) as

property involved in money laundering (in violation of  18 U.S.C. § 1956(a)(1) and

conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).

50.    There is probable cause to believe that all funds, monies, and other things

of value stored in or accessible at Binance associated with user ID ending in 4010 in the

name of Wang-Lu constitute proceeds traceable to violations of 18 U.S.C. § 1343, and/or

a conspiracy to commit such offense in violation of 18 U.S.C. § 1349,  and are therefore

subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

Respectfully submitted,

J. BLAKE CARTER, Special Agent
United States Secret Service

Exhibit A-31